PITTMAN, Judge.
James Ernest Phillips (“the employee”), a firefighter formerly employed by the City of Hoover (“the City”), sued the City in the Shelby Circuit Court[1] in July 2001 seeking benefits under the Alabama Workers’ Compensation Act, § 25-5-1 et seq., Ala.Code 1975 (“the Act”); the employee claimed to have suffered an injury to his cardiovascular system arising out of and in the course of his employment or, in the alternative, claimed to have suffered from cardiovascular disease that was occupational in nature and therefore compensable under the Act. The City answered the complaint, denying its pertinent allegations and asserting that the employee had not given the City notice of his injury. After an ore tenus proceeding, the trial court entered a judgment in favor of the employee, stating findings of fact and conclusions of law and determining both that the employee was permanently and totally disabled as a result of a work-related injury and that the employee suffered from occupational heart disease. The City’s post-judgment motion for a new trial was denied, and the City appeals.
The City raises three issues on appeal: (1) whether the City had proper notice of the employee’s claim; (2) whether causation by the employee’s employment v?as demonstrated; and (3) whether the employee suffered from an occupational disease. This court will not reverse a judgment based on the factual findings of the trial court in a workers’ compensation case if those findings are supported by “substantial evidence.” Ala.Code 1975, § 25-5-81(e)(2). “Substantial evidence” is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of im *994 partial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., Inc., 680 So.2d 262, 268 (Ala.1996) (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). Pursuant to that principle of review, “ ‘the trial court’s findings on disputed evidence in a workers’ compensation case are conclusive,’ ” and this court must not “ ‘weigh the evidence before the trial court.’ ” Ex parte Golden Poultry Co., 772 So.2d 1175, 1176 (Ala.2000) (quoting Ex parte Ellenburg, 627 So.2d 398, 399 (Ala.1993), and Edwards v. Jesse Stutts, Inc., 655 So.2d 1012, 1014 (Ala.Civ.App.1995)); see also Ex parte Holton, 886 So.2d 83, 84 (Ala.2003). Moreover, we must “consider the evidence in a light most favorable to the findings of the trial court.” Ex parte Staggs, 825 So.2d 820, 822 n. 1 (Ala.2001).
The record reveals the following facts. The employee worked for the City for 23 years as a firefighter with a paramedic certification until June 2000. The employee was diagnosed with heart disease in late 1999 after undergoing an arteriogram; after the employee underwent surgery to have a stent placed in a coronary artery, his treating physician, Dr. Larry E. Dye, returned the employee to work with no restrictions, although he was prescribed nitroglycerin. The employee was medically recertified by the City’s fire-department physician, and he resumed his normal work routine thereafter.
At approximately 8:00 a.m. on June 2, 2000, the employee reported to work pursuant to a “twenty-four on, forty-eight off’ schedule (ie., the employee remained at a fire station for a 24-hour work shift, including on-duty sleep periods, that was to be followed by 48 hours off work). The employee performed paperwork and undertook continuing-education lessons during the first hours of his shift, and then he went to sleep.
At approximately 10:00 p.m. that evening, a fire-alarm call was received at the employee’s fire station. The employee testified that when the fire station receives such a call when he is asleep, he must awaken, dress in protective gear, and board a fire engine with his crew within 30 seconds. On this occasion, after arriving at the scene of the fire, the employee reported to a division chief at the bottom of a slight incline, and then began walking uphill to rejoin his company; however, as the employee walked up the hill, he began to experience burning chest pains. The employee completed his climb and informed his crew, as they reboarded the fire engine, that he was experiencing chest pains. Although he was uncertain why he was experiencing chest pains, the employee apparently initially believed that those pains could have been caused by particularly spicy chili that he had consumed in the firehouse that evening because his symptoms did not resemble the pain he had previously experienced in late 1999. Upon returning to the station, the employee submitted to a blood-pressure examination; ingested a nitroglycerin tablet, a dose of aspirin, and an antacid; and returned to bed after his symptoms subsided.
At approximately 2:00 a.m. on the morning of June 3, 2000, the fire station received another emergency call arising from a fall suffered by an elderly resident of an extended-care facility. The employee’s fire company responded to the call and transported the resident for medical treatment. The employee reported similar chest-pain symptoms after awakening and boarding the fire engine on this occasion; upon his return to the fire station, he repeated his medications, which reduced his chest pains considerably, and he filled *995 out a written report of his fire crew’s response to the emergency call before again falling asleep.
The employee completed his work shift at 8:00 a.m. on June 3, 2000, at which time he reportedly was continuing to experience low-grade pain symptoms. After leaving work, the employee went to the home of one of his friends to help construct wooden outdoor steps along an incline. However, while the employee was at his friend’s home, his chest-pain symptoms again set in. When nitroglycerin did not alleviate the employee’s symptoms, an emergency call was placed on the employee’s behalf; the responding personnel connected the employee to a heart monitor that revealed that the employee was actually undergoing a myocardial infarction (ie., a heart attack). The employee was then transported to a local hospital emergency room for immediate heart-catheterization treatment; although the employee’s occluded coronary artery was opened and his heart was stabilized, he contracted a severe infection caused by staphylococcus bacteria, requiring his hospitalization for over three weeks.
While the employee was being treated in the hospital emergency room, he was visited by the City’s fire chief, Tom Bradley, and by a co-employee, Rusty Lowe. Although he was under medication at the time of that visit, the employee testified that he remembered “very clearly” that during their hospital visit he had said to Fire Chief Bradley that he had had no doubt that the heart attack had started while he was ascending the incline during his first fire call on June 2, 2000; he added that he and Fire Chief Bradley had discussed a fire-department training film that had involved a firefighter succumbing to a heart attack while administering aid to a patient during an emergency call. In response, according to the employee, Fire Chief Bradley directed the employee not to worry; he also indicated to the employee that “everything would be handled” with respect to workers’ compensation. The employee also testified that first notices of firefighters’ injuries to the City would typically be completed by a firefighter’s supervisor when the injured firefighter was unable to return to work after an injury to complete a notice form, and there was evidence that Fire Chief Bradley had completed injury-notice forms on behalf of the employee in the past.
Upon recovering from his infection, the employee underwent successful cardiac-bypass surgery performed by Dr. John Richardson, Jr.; however, the employee was ultimately instructed by Dr. Dye that he should not return to work for the City as a firefighter. Although the employee apparently believed he was receiving workers’ compensation benefits during his extended convalescence, he was informed in November 2000 that he had actually been receiving payment for his accumulated leave time and that other firefighters had donated such time to him so that he could qualify for retirement. In December 2000, the employee signed a “first notice of injury” form that one of his co-employees had prepared with respect to his heart attack; he also sought disability benefits at that time and applied for a service retirement, which was granted. The employee has been determined by the Social Security Administration to be totally disabled, and no issue has been raised by the City concerning the permanency or the totality of the employee’s disability.
As we have noted, the employee’s workers’ compensation claim was not based solely upon the proposition that his heart attack was a discrete work-related injury compensable pursuant to Article 3 of the Act; rather, the employee alternatively contended that his heart disease was *996 an “occupational disease” compensable under the provisions of Article 4 of the Act, and the trial court also found in favor of the employee on that alternative contention. If a workers’ compensation claimant asserts entitlement to permanent-total-disability benefits under both Article 3 and Article 4 of the Act, and the trial court subsequently awards permanent-total-disability benefits (as in this case), this court will affirm the trial court’s judgment if the evidence supports an award under either article, even if an award would not be appropriate under the other article. See Bidermann Indus. Corp. v. Peterson, 655 So.2d 997, 999 (Ala.Civ.App.1994) (“Our conclusion that [the employee] did not suffer from an occupational disease, however, is not dispositive of this appeal because we find that recovery was proper under the ‘accident’ provisions of the [A]et.”).
Like we did in Bidermann, we first address the issue of whether compensation was proper based upon Article 4. The City contends that the trial court erred in determining that the employee’s heart disease giving rise to his heart attack was an occupational disease under Article 4. It cites § 25-5-81(c), Ala.Code 1975, which generally provides for a “clear and convincing evidence” standard of proof with respect to cumulative-stress injuries, as authority for its argument that the employee did not demonstrate causation by “clear and convincing evidence.” However, this court has previously held that the “clear and convincing evidence” standard does not apply to occupational-disease claims under Article 4 because Article 4 treats death or disability caused by an occupational diseases as an “injury by accident.” Drummond Co. v. Moore, 730 So.2d 222, 224 (Ala.Civ.App.1998); see also 1 Terry A. Moore, Alabama Workers Compensation § 9:18.50 (Supp.2003) (agreeing that “clear and convincing evidence” standard set forth in § 25-5-81 (c) does not apply to occupational-disease claims). The employee’s contention that the “preponderance of the evidence” standard of proof and the “substantial evidence” standard of appellate review apply to his occupational-disease claims is, therefore, correct. See Ala.Code 1975, §§ 25-5-81(c) and 25-5-81(e)(2).
Under Article 4 of the Act, for a condition to be classified as an “occupational disease,” that condition or ailment “must be ‘due to hazards in excess of those ordinarily incident to employment in general and [be] peculiar to the occupation in which the employee is engaged.’ ” Avondale Mills, Inc. v. Weldon, 680 So.2d 364, 366 (Ala.Civ.App.1996) (quoting Ala.Code 1975, § 25-5-110(1)). Also, to prove entitlement to compensation, a claimant “must prove causation or aggravation of an existing condition.” Avondale Mills, 680 So.2d at 366 (emphasis added). Stated another way, under Alabama law, “[a]n occupational disease is not compensable if it is not caused or aggravated by the nature of the employment.” Id. We further note that recent authority indicates that cardiovascular conditions ultimately giving rise to a heart attack are more properly treated, as a legal matter, as “occupational diseases” under Article 4 rather than as nonacci-dental injuries under Article 3. See Safeco Ins. Cos. v. Blackmon, 851 So.2d 532, 536-37 (Ala.Civ.App.2002).
Was the employee’s heart disease an “occupational disease” that was, at least, aggravated by his employment? There was substantial evidence that the employee’s particular work as a firefighter exposed him to more sudden, stressful conditions than those ordinarily incident to employment in general and that those conditions contributed to the development of his heart disease. According to the employee, the symptoms of his heart at *997 tack first manifested themselves on the evening of June 2 and the early morning of June 3, 2000, while he was working a 24-hour shift. On two separate occasions during that shift, he was awakened and was required to dress and equip himself in full fire gear in less than a minute in order to board a fire truck that was responding to an emergency call. Dr. Dye described the chest pains experienced by the employee during that shift as the “beginning symptoms” of a heart attack; Dr. Dye specifically identified immediate abrupt increases in heart rate and blood pressure arising from responding to fire alarms, such as those to which the employee testified, as stressors on the heart and the vascular system.
Although Dr. Dye testified that heart disease is generally caused by a buildup of arterial plaque, a process that begins during childhood, he added that “it progresses at different rates in different people according to their risk factors.” Dr. Dye opined that the employee’s work as a firefighter was a “stressful” and “high risk” occupation and that the employee’s occupation was a “significant part” of his risk of developing heart disease and suffering a heart attack; he agreed that the inhalation of fumes and smoke would also be a risk factor for developing heart disease. Dr. Dye based his opinions, in part, on his medical observations of other firefighters.
In addition, Dr. Richardson agreed that a person working as a firefighter, where sudden, intense energy demands are required, is at a higher risk of having a heart attack than people employed generally. Fire Chief Bradley testified to the effect that he considered the employee’s heart condition to be related to his employment as a firefighter; Bradley identified two other individuals who had served under his command who had suffered heart attacks while on duty, and the employee testified that firefighters suffering heart attacks had been “a fairly common event” during his 23-year tenure of employment. Finally, as the trial court judicially noticed, an Alabama statute governing firefighters’ compensation specifically identifies conditions or impairments of health arising from “heart disease” as being “occupational diseases” of firefighters.[2] Ala.Code 1975, § 11 — 43—144(a)(3); see also Chrysler Corp. v. Henley, 400 So.2d 412, 417 (Ala.Civ.App. 1981) (Wright, P.J., concurring specially) (citing § 11— 43 — 144 for the proposition that “firemen are regularly exposed as a general group to the conditions contributing to heart disease”). We cannot conclude that the trial court erred in determining that the employee’s heart disease was an occupational disease that was aggravated by his employment as a firefighter such that compensation under Article 4 of the Act was proper.
Although our conclusion with. respect to compensability under Article 4 is arguably dispositive of the appeal under Bidermann, we will, out of an abundance of caution, turn to the employee’s alternative theory — that his heart attack was a compensable nonaccidental injury. Noting that the employee’s first written notice of injury was not prepared by fire-department personnel and signed by the employee until early December 2000, the City contends that the employee did not afford adequate notice under the Act with respect to his nonaccidental-injury theory. The City relies on that portion of the Act, Ala.Code 1975, § 25-5-78, providing that *998 an injured employee “shall give or cause to be given to the employer written notice of the accident” made the basis, of the-employee’s claim for workers’ compensation benefits;[3] that section also provides that “no compensation shall be payable unless written notice is given within 90 days after the occurrence of the accident.” We summarized many of the pertinent principles of law concerning effective notice under the Act in Davis v. Paragon Builders, 652 So.2d 762 (Ala.Civ.App.1994):
“The purpose of written notice is to advise the employer that the employee received a specified injury, in the course of his employment, at a specified time, and at a specified place, so that the employer may verify the injury by its own investigation. Written notice is not required where it is shown that the employer had actual notice of the injury. Oral notice is sufficient to give the employer actual notice. Like written notice, oral notice imparts to the employer the opportunity to investigate and to protect itself against simulated and exaggerated claims. Even with oral notification, the employer must be notified that the employee was injured while in the scope of his employment. The fact that an employer is aware that the employee suffers from a malady or has medical problems is not, by itself, sufficient to charge the employer with actual notice. ‘If, however, the employer has some information connecting work activity with an injury, it may be put on reasonable notice to investigate further.’ Knowledge on the part of a supervisory or representative agent of the employer that a work-related injury has occurred will generally be imputed to the employer. The employee has the burden of proving that the employer had notice or knowledge of the injury.”
Davis, 652 So.2d at 764 (citations omitted).
As we noted in Davis, an employer may properly be found to be on reasonable notice when the employer, or a supervisory agent of the employer, becomes aware of information connecting an employee’s work activity with an injury to the employee. See also Ex parte Slimp, 660 So.2d 994 (Ala.1995) (reversing this court’s judgment of reversal based upon lack of notice where evidence appeared in record that employee notified his supervisor that he had hurt his back on the day he was injured). The trial court’s judgment properly concluded that the employee’s having informed Fire Chief Bradley, just after the employee’s hospitalization, of the original onset of his symptoms in the line and scope of his employment during an emergency fire call sufficiently conveyed “reasonable notice” of a connection between the employee’s work activity and his subsequent injury, so as to defeat the City’s contention that notice was not given. Davis, 652 So.2d at 764.
To the extent that the trial court awarded workers’ compensation benefits based upon a determination that the employee’s heart attack was a nonaccidental injury under Article 3 of the Act, we conclude that the trial court’s judgment is supported by substantial evidence. The City has conceded in its initial brief to this court that legal causation of the heart attack by the employee’s work was established; as to the employee’s nonaccidental-injury theory, the City addressed only the issue of medical causation in its initial appellate brief.[4] As to medical causation, *999 much of the evidence we have detailed above provides support for the proposition that the employee’s heart attack is causally related to the cardiovascular stress he was subjected to in responding to the two emergency calls on June 2 and 3, 2000. While Dr. Richardson opined that the employee’s heart attack did not occur until the employee had left his employment for the day on June 3, Dr. Dye testified that the employee’s heart attack actually began on June 2 during his work shift and that the precipitating events would have been the fire alarms and the stress on the employee’s body. Substantial evidence indicates that the employee’s work was in fact a “contributing cause” of his heart attack so as to render the City liable to pay workers’ compensation benefits on a non-accidental-injury theory. See Ex parte Trinity Indus., 680 So.2d at 270.
Based upon the foregoing authorities, and viewing the evidence in a light most favorable to the findings of the trial court, Ex parte Staggs, 825 So.2d at 822 n. 1, we conclude that the trial court’s judgment is due to be affirmed.
AFFIRMED.
YATES, P.J., and CRAWLEY, J., concur.
THOMPSON, J., concurs in the result, without writing.
MURDOCK, J., concurs in the result, with writing.

. Although the City’s seat of government is located in Jefferson County, the City's territorial limits include land located within Shelby County, and a workers' compensation action may therefore be brought against the City in either venue. See Ala.Code 1975, §§ 6-3-11 and 25-5-88, and Ex parte City of Haleyville, 827 So.2d 778 (Ala.2002).

. Citing Byrd v. State ex rel. Colquett, 212 Ala. 266, 102 So. 223 (1924), the City contends in its reply brief that the trial court could not take judicial notice in the absence of a request on the part of counsel that it do so; however, Rule 201(c), Ala. R. Evid., provides that a court "may take judicial notice whether requested or not.”

. We note that pursuant to § 25-5-123, Ala. Code 1975, the provisions of § 25-5-78 do not apply to occupational-disease claims under Article 4 of the Act.

. Notably, the City did not reply to the employee's arguments regarding medical causation in its reply brief.